HAWKINS, Presiding Justice,
for the Court:
ON APPLICATION FOR LEAVE TO FILE MOTION TO VACATE THE JUDGMENT AND DEATH SENTENCE
Lazaro Faraga has petitioned this Court to vacate his judgment of conviction and sentence in the circuit court of Rankin County, or alternatively to grant him leave to file a motion in that court to vacate the judgment and conviction.
We reject Faraga’s request for this Court to vacate his judgment of conviction and sentence, but do grant his petition for leave to file a petition for such relief in the circuit court of Rankin County on the claims of failure to furnish Faraga’s counsel an exculpatory statement, and ineffective assistance of counsel. Miss.Code Ann. § 99-39-5, -7, -27 (1984).
We find Faraga’s other assigned grounds for such relief unpersuasive and reject them.
Faraga was convicted in the circuit court of Rankin County in February, 1986, of capital murder [Miss.Code Ann. § 97 — 3—19(2)(f) (1983)] while engaged in the crime of child abuse [Miss.Code Ann. § 97-5-39(2)], and sentenced to death. The crime for which Faraga was convicted occurred in Rankin County on December 19, 1985. Sherry Royal, a woman with whom Faraga had been living in Florida, had gone to Dallas, Texas, where Faraga was in jail to get him released on bail, and return to Florida. Faraga’s stepfather in Florida had got the funds to make his bail bond.
Faraga and Royal were en route to Florida, with Faraga driving. In the car with the couple were Royal’s five-year-old daughter Cachi (Cashe), two smaller children, twins, who were the couple’s children, and a two-month-old infant Lorenso Nathaniel Faraga. Whether this infant was Faraga’s child or not is not clear. According to Royal the baby was his child, but Faraga never acknowledged being the infant’s father. As set forth in the original opinion in this cause, Faraga v. State, 514 So.2d 295 (Miss.1987), Faraga, while driving on U.S. 1-20 at a high rate of speed, suddenly stopped the car, and over Royal’s protests and resistance took the infant out of the car, slammed it onto the hood of another car and then threw it onto the pavement, killing it.
Faraga was subdued and arrested. That same day law enforcement officers took a recorded statement from Royal, pertinent portions of which read as follows:
Q. Listen, Sherry, why did he do this?
A. Why? I don’t know, because he left Texas jail, and they put him, and he was in this center with the crazy people and they put him in, they thought he was crazy, but you know, crazy, but then they gave him some kind of pill and the pill that they gave him kinda like, you know, I guess [unintelligible] and since then he just started acting weird since he got out, out of jail ’cause for a long period of time he was in there he couldn’t take it from staying in there. And they put him in this room where the crazy people are at and I don’t know ...
⅜ * sfc * * *
Is this his child? •©*
Yes. <4
And what’s the child’s name? <3*
Lorenzo. But you see we don’t sign papers for the child’s name going to go in his last name, Faraga. <d
[[Image here]]
Why did he stop the car? &
’Cause he was thinking all this stuff about he was going back to Cuba and all that about Castro, what Castro did to them when they was in Cuba and all of this. And then he, what he was saying, I couldn’t hardly understand it, but he was saying some of it in Spanish and I don’t hardly understand Spanish, when he talks fast, I don’t understand it. i> *773 When he goes a little slow, I understand. So I couldn’t hardly understand, I couldn’t hardly understand him. And then he took my two twins and put them out [unintelligible] in the street. And then he go take my baby Lorenzo, put my baby out. And then he, he, he banged my baby, he throw my baby down.
Q. He picked your baby up in his hands?
A. Yeh. He banged my baby down.
Q. On the road?
A. Yes, [unintelligible] he grabbed my baby [crying, unintelligible] help me, help me and my baby [unintelligible].
* * * * * *
Q. Okay. Did he assault any of your other children?
A. No. No, only my baby.
Q. Was there some discussion about the child before he did this?
A. No. He was talking in Spanish and I didn’t understand him in Spanish.
Q. Was he mad at the baby?
A. No. I don’t know.
Q. Was he mad at you?
A. No.
Q. Was he mad at the other children?
A. No. His mind just [snapped or clicked], it just [cracked or clicked] and I don’t know ...
Q. Was he drinking?
A. No, he wasn’t drinking, or nothing.
Q. Was he using any drugs?
A. No.
Q. You had been with him for how long?
A. For how many years?
Q. No. How many hours prior to this?
A. But he didn’t drink or nothing.
Q. No drugs or alcohol?
A. No.
Q. You all come in — when you picked him up in Texas coming this way, no drugs or alcohol?
A. No. No, he didn’t — he didn’t do no drugs or nothing.
Q. Okay. So he wasn’t under the influence of anything that you knew of.
A. No.
Q. What you are saying is, that he picked your baby up and threw it on the ground and you don’t know why or what caused it?
A. He was saying something like, Castro, Cuba and then he said something like, Castro, Cuba, that he going to get time for what he went to jail for in Texas and that he was going to get time for that. And all kinds of stuff in Spanish and then he went on and on.
* * * sk * *
Q. You all lived together since 1980? He’s the father of all your children?
A. Uh, huh.
Q. All right. Where else has he been in jail beside Texas that you know of?
A. Oh, he was in jail in Miami, Florida for a license, suspending a license.
Q. What about in Cuba?
A. No — but he was in jail in Cuba. He told me a long time ago that Castro took him in jail for a month and he’d been in jail — Castro’s jail for I think four years.
Q. Is he an American citizen now?
A. Uh huh.
Royal was not subpoenaed either by the defense or the State. By affidavit dated December 15, 1988, and filed with the petition (Exhibit 3), she states that Faraga’s behavior following his release on bail in Texas was frightening, that in the hotel he would “speak with the television and with the walls.” She then details bizarre behavior of Faraga just preceding the slaying. She states further that following the slaying Faraga did not believe her when she told him in the jail what had happened. She then states:
16. No one asked me to appear at Lazaro’s trial. If I had been told of the trial, I would have attended for the purpose of offering testimony. No one told me when the trial was to be held.
*774 17. I was never contacted by Cullen Taylor [Faraga’s attorney] nor have I ever spoken with or received any correspondence from Mr. Taylor.
18. I do not want Lazaro to be executed. Lazaro is not a violent man. He loves his children. If Lazaro were executed, I do not know how I could ever tell Cashe and the twins.
19. ... After the officers talked With me, I gave them my name and address. I told them to please let me know when Lazaro’s trial would be because I wanted to be present.
20. I would have testified to the matters contained in the transcript of my statement and in this affidavit if I had been called as a witness at Lazaro’s trial.
By affidavit dated December 2, 1988, and filed with the petition (Exhibit 7), Faraga’s trial court counsel Cullen C. Taylor states:
5. The entire discovery that I received from the District Attorney’s office consisted of a memorandum of discovery consisting of two pages and one tape of Mr. Faraga’s initial statement. At no time did I receive a tape or statement of Sherry Royal’s or did I know that she made one.
6. Present Counsel for Mr. Faraga, Hon. Ken Rose, has furnished me with a transcript of Sherry Royal’s statements to the Police. Had I known about the context of these statements, I would have used them at the sentencing phase of the Trial.
Ken Dickerson, the deputy sheriff of Rankin County who took the recorded statement from Royal, by affidavit dated February 15, 1989 (Exhibit B to State’s Response Brief), states:
Mr. Taylor came to my office to investigate the case. I played three times a tape recording of Faraga’s statement for Mr. Taylor and told him about Sherry Royal’s taped statement. I do not recall him listening to her tape. However, while he was in my office I gave him her telephone number, which he called. He indicated to me that she said that could not help Faraga and would not come to court.
Mr. Taylor had access to Sherry Royal’s tape. I felt her tape further showed Faraga’s guilt and certainly had no reason to withhold the tape from Mr. Taylor.
By affidavit dated February 15, 1989 (Exhibit C to State’s Reponse Brief), Taylor again addressed the matter of this tape and the prospect of Royal testifying in the cause:
During my investigation of the case, I went to Chief Deputy Ken Dickerson’s office. A tape recording of Faraga was played for me to my satisfaction. Sherry Royal had been released from jail in Rankin County before I was appointed as counsel for Faraga. A telephone number in Florida for Sherry Royal was given to me and, after reflection and, after talking with Ken Dickerson, I called the number and asked for Sherry. I spoke to a woman identifying herself as Sherry Royal and I inquired about her coming to Court on Faraga’s behalf. The woman said she could not help him and would not come because Faraga was the one that “killed her baby.” I do not remember being shown her tape recording or listening to it being played....
I did not believe that it would be in my client’s best interest to compel by subpoena people to come after they indicated their testimony would be unfavorable and did not desire to come. They may have become witnesses for the State if they had appeared.
Also filed with Faraga’s petition are affidavits of Miguel Moreira, his stepfather, and of Angela Solano, Moreira’s wife, that on the morning of December 19, 1985, Far-aga called her long distance and told her the Russians had written a letter to Fara-ga’s mother in Cuba that they were going to deport Moreira to Cuba, and also the Russians had written Ronald Reagan, who had all their names and was going to deport them to Cuba.
Moreira’s affidavit states that following a head injury in 1982 Faraga was never the same, that his personality and thinking ability changed. He also states in the affidavit that Faraga called him constantly from the Dallas jail “emotionally upset and *775 hyper,” and saying they “had put him a room for the insane (psychotic ward) and had given him pills.”
Both Moreira and Solano state they were never contacted by Taylor, and if they had been notified they would have come to his trial. Since Moreira had raised the bail bond funds necessary to get him released on a $25,000 bail bond in Texas it is reasonable to assume he would have wanted to help Faraga as well in the Mississippi trial.
Faraga could speak but very little English, and essentially all communication between Faraga and his counsel and the court had to be through an interpreter. On February 10, under a court order, Faraga was committed to the Whitfield State Hospital for a mental examination, and released February 13. It was the opinion of the staff that Faraga knew the difference between right and wrong. Defense counsel did not interpose a defense of insanity at his trial.
LAW
Taylor by his first affidavit indicates he never heard Royal’s statement or read a transcript of it. Dickerson states he told Taylor of the tape. Taylor’s second affidavit states he “does not remember being shown her tape recording or listening to it being played.” It is incredible that Taylor could actually have listened to this tape and not have remembered it.
The tape was clearly exculpatory material, corroborating Faraga’s claim that he was at le.ast temporarily insane at the time he committed the atrocity. It should have been furnished him by the State, and if Taylor did not ask for it upon being told there was such a tape recording, as Fara-ga’s attorney he should have. Brady v. Maryland, 373 U.S. 83, 87, 83 S.Ct. 1194, 1196-97, 10 L.Ed.2d 215, 218 (1963); United States v. Agurs, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976); United States v. Bagley, 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985); Smith v. State, 500 So.2d 973 (Miss.1986).
One great question immediately comes to any person’s mind upon learning anything about the physical facts of this slaying. Why did Faraga do it? Indeed, that was the first thing on Dickerson’s mind when he questioned Royal.
She did not reply that he did it because he was evil. She said she did not know, but that in Texas he was in a center “with the crazy people,” and “they gave him some kind of pill,” and he started “acting weird since he got out.”
Counsel’s failure to pursue some other reason, some mitigating reason for this bizarre behavior other than conceding at trial that the proof showed murder but not capital murder, from the affidavits and materials submitted to this Court, suggest at the very least that the standards of Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), and Leatherwood v. State, 473 So.2d 964, 970-971 (Miss.1985), were not met by defense counsel.
For these reasons we grant Faraga’s application for leave to file, and remand this matter in the circuit court of Rankin County on the questions of whether Lazaro Far-aga was denied exculpatory material to his prejudice demanding a new trial, and/or whether he received effective assistance of counsel under Strickland and Leatherwood, supra.
If the circuit court finds in Faraga’s favor on either or both these grounds, it should enter an order for a retrial, subject to the State’s right to appeal the decision. If the circuit court finds against Faraga on both grounds, that likewise will be subject to his right of appeal such finding to this Court.
APPLICATION FOR LEAVE TO FILE MOTION TO VACATE JUDGMENT AND DEATH SENTENCE GRANTED WITH DIRECTIONS.
ROY NOBLE LEE, C.J., DAN M. LEE, P.J., and PRATHER, ROBERTSON, SULLIVAN and ANDERSON, JJ., concur.
PITTMAN and BLASS, JJ., not participating.