## IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2002-DR-00686-SCT

*HOWARD DEAN GOODIN (GOODEN)*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 05/19/1999 |
| TRIAL JUDGE: | HON. MARCUS D. GORDON |
| COURT FROM WHICH APPEALED: | NEWTON COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | TERRI L. MARROQUIN |
| | ROBERT M. RYAN |
| ATTORNEYS FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: JUDY T. MARTIN |
| | MARVIN L. WHITE, JR. |
| DISTRICT ATTORNEY | KEN TURNER |
| NATURE OF THE CASE: | CIVIL - DEATH PENALTY - POST CONVICTION |
| DISPOSITION: | APPLICATION FOR LEAVE TO SEEK POST-CONVICTION RELIEF GRANTED IN PART AND DENIED IN PART - 08/07/2003 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

## EN BANC.

## CARLSON, JUSTICE, FOR THE COURT:

¶1.     Howard Dean Goodin was convicted of capital murder and sentenced to death for the murder of

Willis Rigdon.  Goodin's conviction and sentence were affirmed by this Court on direct appeal. *See*

*Goodin v. State*, 787 So.2d 639 (Miss.  2001), *cert. denied*, 535 U.S. 996, 122 S. Ct. 1558, 152 L.

Ed. 2d 481 (2002). Goodin filed his Application for Leave to File Petition for Post-Conviction Relief in this

Court on April 30, 2002, raising nine grounds for relief under the Mississippi Uniform Post-Conviction Collateral Relief Act, Miss. Code Ann. § 99-39-1 to -29 (Rev. 2000 & Supp. 2002). While many of the issues are procedurally barred, we consider them to the extent necessary to address Goodin's claims of ineffective assistance of counsel and mental illness. Finding that he has succeeded in presenting a substantial showing of the denial of a state or federal right and that his attorney's performance at trial was constitutionally deficient, we grant Goodin's application for leave to seek post-conviction relief in part and deny it in part.

## FACTS

¶2.     The following statement of facts is taken from this Court's opinion:

The events which occurred inside Willis Rigdon's Store and Restaurant in the early morning hours of November 5, 1998, were recorded by surveillance cameras. The surveillance tapes show a black man, identified as Howard Goodin, entering Rigdon's Store in Union, Mississippi, around 1:44 a.m. Goodin browsed around the video rental section for a few minutes before pulling a gun on the owner of the store, Willis Rigdon. Goodin then disconnected a surveillance camera and the TV and VCR to which it was attached. The tape shows Goodin and Rigdon exiting the store carrying the surveillance camera, TV, and VCR. The two men reenter the store and exit once again with Goodin waving a gun and Rigdon holding his hands in the air. At 1:57 a.m. a witness drove by Rigdon's Store and saw Rigdon sitting in his truck on the driver's side and a black man hunched over in the passenger side.

Shortly after 2:00 a.m., Mitchell Graham and his wife, who live about one mile from the Union city limits and about four miles from Rigdon's store, were awakened by someone knocking on their front door and ringing their door bell. Graham went to the door and, without opening the door, asked who was there. There was no response. Thinking it might be a trouble maker, Graham's wife called her father and told him to drive down to their house to scare the person away. When Graham saw his father-in-law's car, he turned on the outside light and opened the door to find Willis Rigdon lying face down in a pool of blood on the front porch. Rigdon was bleeding profusely from two gunshot wounds to the head and neck. Graham's wife called 911 to request an ambulance.

Graham asked Rigdon what happened, and he stated that he had been shot and robbed. Graham then asked Rigdon if he knew who did it. Rigdon replied, "No, I don't. It was a

2

black man." Rigdon was then transported to the hospital where he subsequently died as a result of the gunshot wounds.

Between 3:00 and 3:30 a.m., Goodin was seen in Philadelphia, Mississippi, driving Rigdon's truck and carrying a large sum of money. Philadelphia is approximately thirteen miles from the city of Union. At 4:30 a.m., Goodin, still driving Rigdon's truck, went to the home of his nephew, Kelly Junior Peden, who resides in Philadelphia. Peden noticed that the steering column of the truck was broken. Goodin later attempted to start the truck with a screwdriver, but was unable to do so. Peden then became suspicious and told Goodin that he could not leave the truck in his driveway. Goodin then removed the license plate from the truck and threw it away.

Goodin left Peden's house and walked to the home of his cousin, Iris Owens, and asked her to drive him to Union. She told him that she did not drive at night and instead called a tow truck. The tow truck driver, John Raymond Roberts, picked Goodin up at Owens' home and drove him to Peden's home. Roberts asked Goodin who owned the truck, and Goodin responded, "This white fellow in Union." Roberts noticed that the truck had no license plate and that the steering column was broken. He told Goodin that he would have to call the police department and have the VIN number run before he could tow the truck. Goodin told Roberts to do whatever he wanted with the truck but to take him back to Owens' house. Before the men left the Peden house, Goodin got a TV and VCR out of the back of Rigdon's truck and put it in the tow truck. Goodin then gave Roberts $50.00 from a long sock of money he had in his pocket. Roberts then drove him to Iris Owens' house. As Goodin exited the tow truck, he told Roberts, "You don't know me, and I don't know you." Goodin took the TV and VCR into Owens' house.

Iris Owens testified that Goodin returned to her house with a VCR and TV. He then left saying he would be back to get the VCR and TV. Goodin never returned. Later that morning, the police came to Owens' house. Owen turned the VCR and TV over to the police. The police asked Owens whether Goodin was armed when he was at her house. She told the police that she had not seen a gun. She later found a gun hidden among her crochet items. She then called the police who returned and retrieved the gun.

When Goodin's nephew, Peden, heard about the robbery and description of the truck, he called the police and told them that a truck fitting that description was at his house. Tow truck operator Roberts saw the surveillance tapes showing Goodin and Rigdon on a news broadcast. He too notified the police. Based on the information from the video surveillance tapes and the statements of Peden, Roberts and Owens, the police began searching for Goodin. They arrested him later that day at the home of Jetty Mae Kelly in Philadelphia, Mississippi. He had a stocking filled with $590.00 in his pocket at the time of the arrest.

Goodin was booked, and an officer took him to get a shower and change into jail clothes.

At this time Goodin took $200.00 out of his socks. After his shower, Goodin took another $700.00 out of his mouth.

Goodin was tried as a habitual offender in the Circuit Court of Lamar County for the capital murder of Willis Rigdon during the commission of a kidnapping in Count I and armed robbery in Count II. Goodin's previous convictions include:

1972 Shoplifting 2 years

1973 Burglary 5 years

1977 Second Degree Sexual Assault 7 years, each
robbery count, concurrent
burglary

1980 Armed Robbery 25 years

1982 Aggravated Assault 25 years
armed Robbery
attempted Armed Robbery
assault on a Law Enforcement Officer

1995 Burglary 6 years

Goodin had been out of prison only five months before the murder. The jury convicted Goodin on both counts and sentenced him to death by lethal injection.

*Goodin*, 787 So.2d at 642-43.

¶3.     On April 30, 2002, Goodin filed his Application for Leave to File Petition for Post-Conviction Relief with this Court. In order to supplement his original petition, Goodin filed a rebuttal brief with additional exhibits on November 18, 2002. Therefore, the State has filed a Motion to Strike Petitioner's Rebuttal Brief which this Court will address in addition to the issues raised by Goodin in his application.

### DISCUSSION

¶4.     Goodin's application raises the following issues:

### I. Procedural History

## II. Preservation of Issues

## III. Standard of Review

¶5.     Under these first three issues, Goodin discusses procedural matters which will be discussed as follows under each issue as necessary.

### IV.     Whether Petitioner's constitutional rights under the Sixth, Eighth, and Fourteenth Amendments of the United States Constitution and Article Three, Sections 24, 26, 28 and 29, of the Mississippi Constitution were violated by numerous instances of prosecutorial misconduct.

¶6.     On direct appeal Goodin alleged that the trial court erred in allowing the State to argue, in closing argument in the sentencing phase, that Willis Rigdon did not have the protection of the law, the jury system and the Constitution the night of his murder as did Goodin during his trial. This Court found no reversible error, stating:

> We have previously found similar arguments to be error, though not reversible since the statements were made in isolation. *See **Wells v. State***, 698 So.2d 497 (Miss. 1997); ***Davis v. State***, 684 So.2d 643, 654 (Miss. 1996); ***Shell v. State***, 554 So.2d 887, 900 (Miss. 1989).

> The facts in this case overwhelmingly indicate the defendant's callous indifference to human life. The statutory elements supporting the penalty of death should have been easily met. In such a case, we find it troubling that the prosecutor would exhibit such blatant contempt of the law in order to obtain a death sentence. We have previously cautioned prosecutors against using such statements in closing arguments.

> We must conclude that the district attorney and his assistants in this case have either not comprehended the law or have simply ignored our prior admonishments. When they took their oaths to become attorneys in this state, they swore to "support the Constitution of the State of Mississippi...." Miss. Code Ann. § 73-3-35 (2000). Those who take the oath to become a district attorney, swear to uphold the Constitution of the United States and the Mississippi Constitution. Miss. Const. art. 14, § 268. These oaths are violated when jurors are instructed to ignore constitutional rights. Such blatant disrespect of the prior rulings of this Court, and more importantly, the constitutional rights of the accused will not be tolerated.

Jury decisions should be based on the rational weighing of facts and law. Unnecessary appeals to passion, bias, and prejudice must be avoided. Challenges to a jury to ignore constitutional rights and rules of law are reprehensible and will no longer be overlooked. We have repeatedly criticized this line of argument and have given fair warning to the bar that such statements are in error.

We once more must condemn as strongly as possible arguments evidencing disrespect for the rule of law and the constitutional rights of defendants. However, our review of this case indicates that the prosecutors' crude appeals likely did not influence the jury one way or the other. Evidence of the defendant's callous indifference to human life in this case is overwhelming. The jury's sentence in this case was well-supported by the record. Our respect for the rule of law and the findings of juries constrains us to find no reversible error on this issue. In a closer case, such statements might affect the jury's verdict and warrant reversal, but such is not the case here.

*Goodin*, 787 So.2d at 653-54.

### A.     Whether the prosecution characterized Petitioner as a liar.

¶7.     During closing argument in the guilt phase of the trial, the district attorney argued that Goodin was a liar and that the jury should "punish him for that." No objection was made at trial, and the issue was not raised on direct appeal. Goodin now argues that the district attorney violated his right to a fair trial with this argument. The State answers first that Goodin is procedurally barred from raising an issue that could have been raised on direct appeal but was not. *See* Miss. Code Ann. § 99-39-21(1). The State also argues that the district attorney was merely arguing the facts, answering Goodin's defense that the State's witnesses were lying. The State cites *Hull v. State*, 687 So.2d 708, 721 (Miss. 1996), where we stated, "It is not improper for a prosecutor to comment that the defendant was lying when the contention is supported in the record." We agree that this issue is both procedurally barred and without merit.

**B.** **Whether the prosecution made impermissible arguments in closing comparing the rights of the victim to the rights of the Petitioner.**

¶8.    Goodin argues that it was error to allow the district attorney to make the closing argument that Willis Rigdon did not enjoy the same rights the night of his murder as Howard Goodin was enjoying during his trial. As mentioned above, this argument was raised on direct appeal and rejected by this Court. As such, the State's argument that it is barred by res judicata is correct. *See* Miss. Code Ann. § 99-39-21(3).

**C.** **Whether Petitioner Goodin was denied his right to a fair trial by the willful and repeated actions of the prosecution in this case to comment unfairly on Petitioner's constitutional rights.**

¶9.    Goodin next cites numerous cases from this and other jurisdictions, law journal articles, and professional rules and codes to make the following arguments: (1) prosecuting attorneys have a higher obligation than other attorneys to seek justice and act in an ethical manner, even if it means that they may lose a conviction in the process and (2) attorneys representing the State are rarely sanctioned by professional disciplinary bodies so the courts have an obligation to step into that role where appropriate. Goodin specifically argues that the State violated his right to a fair trial where, on closing argument in the sentencing phase, it argued that capital punishment was endorsed by the Bible. There was no objection at trial by defense counsel, and the issue was not raised on direct appeal. The State argues that Goodin is procedurally barred from making the argument. We agree. *See* Miss. Code Ann. § 99-39-21(1); *Berry v. State*, 703 So.2d 269, 281 (Miss. 1997) (where this Court found that an issue based on the prosecutor's statement that capital punishment was commanded by the scripture was procedurally barred

where there was no contemporaneous objection at trial, and that it was acceptable to use the Bible as a historical reference).

¶10. Goodin finally argues that this particular district attorney, and his office have continually made improper arguments in this and other cases, and that Goodin should be granted relief in order to deter such conduct in the future. Even if such an action would have that result here, this Court would not consider it here, where this issue is without merit under the authority of this Court.

### The State's Motion to Strike Petitioner's Rebuttal Brief

¶11. The next two issues are largely concerned with Goodin's mental condition, as Goodin alleges that he is both mentally retarded and paranoid schizophrenic. Most of the exhibits attached to Goodin's application are concerned with his mental health background. Included are the pretrial evaluation from Dr. Gerald O'Brien, dated February 24, 1999 (Exhibit 2); a Social Security disability report dated April 23, 1998 (Exhibit 3); an unsigned psychological evaluation from Dr. Michael Whelan dated May 1998 (Exhibit 4); a mental health evaluation from Dr. David Powers, dated May 25, 1998 (Exhibit 5); a Disability Determination and Transmittal form dated May 26, 1998 (Exhibit 6); progress notes from Dr. Thomas Welsh in Laird Hospital dated August 10, 1998 (Exhibit 7); an Intake Evaluation Interview dated July 13, 1998 (Exhibit 8); a Weems Mental Health Discharge/Termination Summary dated February 25, 1999 (Exhibit 9); and an unsworn, undated statement from Dr. Michael Whelan (Exhibit 10). Goodin relies on these documents in part to argue that he was and is mentally retarded and cannot be executed and that his trial counsel was ineffective for failure to obtain and be aware of these documents and their contents at his trial in order that it could be argued he was retarded and mentally ill.

¶12. The State responded to these arguments in its brief and in some cases alleges that these exhibits were not probative of the issues or were deficient on various grounds. Goodin then filed his Rebuttal Brief

8

to which he attached additional exhibits, including some of his school records (Exhibit 1); affidavit of Teresa Clemons, Goodin's niece (Exhibit 2); affidavit of Tommie Peden Dennis, Goodin's sister (Exhibit 3); affidavits from Tomika Harris, investigator for the Mississippi Office of Capital Post-Conviction Counsel (OCPCC) (Exhibits 4-7); affidavits from Deidre Jackson, a paralegal from OCPCC (Exhibits 8-9); an affidavit of Dr. Gerald O'Brien, dated November 15, 2002 (Exhibit 10); and an affidavit of Robert N. Brooks, Goodin's trial counsel, dated November 14, 2002 (Exhibit 11).

¶13. The State subsequently filed its Motion to Strike Petitioner's Rebuttal Brief, in which it argues that Goodin cannot present new evidence on rebuttal to shore up arguments shown to be weak or without merit by the State. The State argues that the rebuttal is "an attempt to ambush the State with records and affidavits that were available to the Petitioner at the time the original petition was filed. This is yet another example of how the Mississippi Office of Capital Post-Conviction Counsel continuously files apparently incomplete applications and then seeks to supplement those applications – when the supplemental information could have been obtained through due diligence at the time the petition was filed." The State also argues that Goodin's rebuttal is a "blatant attempt to circumvent the statute of limitations." The State says that it has no procedural mechanism to respond to the new documentation and asks that the rebuttal be stricken.

¶14. Although the State is correct in some of its arguments, a number of the OCPCC's actions were unavoidable, as the law on execution of the mentally retarded changed between the time Goodin filed his original application and his rebuttal. Therefore, this Court finds that the Motion to Strike Petitioner's Rebuttal Brief is not well-taken and denies it.

**V.    Whether the execution of the mentally retarded should be prohibited under the Eighth Amendment to the U.S. Constitution as well as Article Three, Section 28, of the Mississippi Constitution.**

¶15.    Goodin's application was filed on April 30, 2002. Goodin argued that the execution of the mentally retarded should be declared unconstitutional. On June 20, 2002, the United States Supreme Court ruled in *Atkins v. Virginia*, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed. 2d 335 (2002), that the execution of mentally retarded offenders amounted to cruel and unusual punishment and was, therefore, prohibited by the Eighth Amendment to the United States Constitution. Thus, a large portion of Goodin's argument on what the law should be on this issue may be disregarded. What must be considered is the extent to which, if any, Goodin may be entitled to further proceedings under this issue pursuant to *Atkins*.

¶16.    The Supreme Court added in *Atkins*:

> To the extent there is serious disagreement about the execution of mentally retarded offenders, it is in determining which offenders are in fact retarded. In this case, for instance, the Commonwealth of Virginia disputes that Atkins suffers from mental retardation. Not all people who claim to be mentally retarded will be so impaired as to fall within the range of mentally retarded offenders about whom there is a national consensus. As was our approach in *Ford v. Wainwright*, with regard to insanity, "we leave to the State[s] the task of developing appropriate ways to enforce the constitutional restriction upon its execution of sentences." 477 U.S. 399, 405, 416-417, 106 S.Ct. 2595, 91 L.Ed.2d 335 (1986).

*Atkins*, 122 S.Ct. at 2250. The Court noted that "[t]he statutory definitions of mental retardation are not identical, but generally conform to the clinical definitions set forth in n. 3, supra," as stated below:

> The American Association of Mental Retardation (AAMR) defines mental retardation as follows: "Mental retardation refers to substantial limitations in present functioning. It is characterized by significantly subaverage intellectual functioning, existing concurrently with related limitations in two or more of the following applicable adaptive skill areas: communication, self-care, home living, social skills, community use, self-direction, health and safety, functional academics, leisure, and work. Mental retardation manifests before age 18." Mental Retardation: Definition, Classification, and Systems of Supports 5 (9th ed.1992). The American Psychiatric Association's definition is similar: "The essential

10

feature of Mental Retardation is significantly subaverage general intellectual functioning (Criterion A) that is accompanied by significant limitations in adaptive functioning in at least two of the following skill areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety (Criterion B). The onset must occur before age 18 years (Criterion C). Mental Retardation has many different etiologies and may be seen as a final common pathway of various pathological processes that affect the functioning of the central nervous system." American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 41 (4th ed. 2000). "Mild" mental retardation is typically used to describe people with an IQ level of 50-55 to approximately 70. Id., at 42-43.

*Atkins*, 122 S.Ct. at 2245 n.3.

¶17. Goodin argues that he has met his burden of production, that the issue of whether he meets the definition of retardation must be submitted to a jury, and that the State should bear the burden of proving, beyond a reasonable doubt that he is not mentally retarded. In support of his argument, Goodin cites the recent U.S. Supreme Court cases of *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed. 2d 435 (2000), and *Ring v. Arizona*, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed. 2d 556 (2002).

¶18. After he fired several shots into the home of an African-American family in New Jersey, Apprendi was indicted on numerous state charges of shooting and possession of firearms. He eventually pled guilty to two counts of possession of a firearm for unlawful purpose and one count of possession of an explosive. After the judge accepted the guilty pleas, the prosecutor moved for an enhanced sentence on one of the counts because it was a hate crime. The judge concurred and rendered an enhanced sentence of twelve years on that particular count, with shorter concurrent sentences on the other two counts.

¶19. Apprendi argued that he was entitled to have the finding on enhancement decided by a jury. The Supreme Court agreed, stating, "Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Apprendi*, 530 U.S. at 490. However, the Court specifically stated that "Apprendi

11

has not here asserted a constitutional claim based on the omission of any reference to sentence enhancement or racial bias in the indictment. . . . We thus do not address the indictment question separately today." *Id.* at 477 n.3.

¶20. The Court found in *Apprendi* that New Jersey's statutory scheme would allow a jury to convict a defendant of a second degree offense of possession of a prohibited weapon, and then, in a separate subsequent proceeding, allow a judge to impose a punishment usually reserved for first degree crimes made on the judge's finding based on a preponderance of the evidence. The *Apprendi* Court finally stated that its decision did not apply to capital sentencing cases, even in those cases where it was the judge deciding whether to sentence the defendant to death or some lesser sentence. *Id*. at 496-97(citing *Walton v. Arizona*, 497 U.S. 639, 110 S.Ct. 3047, 111 L.Ed. 2d 511 (1990)) (upholding the Arizona capital sentencing process).

¶21. The U. S. Supreme Court subsequently decided *Ring v. Arizona*. *Ring* addressed the issue of whether the Arizona capital sentencing process, as upheld in 1990 in *Walton*, that of a jury deciding guilt and a judge making findings on aggravating factors, survived *Apprendi*. The Supreme Court decided it did not. Despite the efforts in *Apprendi* to distinguish non-capital enhancement cases from aggravating circumstances in capital cases in this context, the Supreme Court in *Ring* found that there was no difference:

> [W]e overrule *Walton* to the extent that it allows a sentencing judge, sitting without a jury, to find an aggravating circumstance necessary for imposition of the death penalty.*See* 497 U.S., at 647-649, 110 S.Ct. 3047. Because Arizona's enumerated aggravating factors operate as "the functional equivalent of an element of a greater offense," *Apprendi*, 530 U.S., at 494, n. 19, 120 S.Ct. 2348, the Sixth Amendment requires that they be found by a jury.
>
> * * *

12

> "The guarantees of jury trial in the Federal and State Constitutions reflect a profound judgment about the way in which law should be enforced and justice administered. . . .If the defendant preferred the common-sense judgment of a jury to the more tutored but perhaps less sympathetic reaction of the single judge, he was to have it." ***Duncan v. Louisiana***, 391 U.S. 145, 155-156, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968).

> The right to trial by jury guaranteed by the Sixth Amendment would be senselessly diminished if it encompassed the factfinding necessary to increase a defendant's sentence by two years, but not the factfinding necessary to put him to death. We hold that the Sixth Amendment applies to both.

***Ring***, 536 U.S. at 609, 122 S.Ct. at 2443.

¶22. The State answers that whether Goodin is mentally retarded is not an aggravating factor necessary for imposition of the death penalty, and ***Ring*** has no application to an ***Atkins*** determination. The State also asserts that the burden of proof is on Goodin in this matter, citing this state's post-conviction statute, Miss. Code Ann. § 99-39-23(7) ("no relief shall be granted under this chapter unless the prisoner proves by a preponderance of the evidence that he is entitled to such"). This Court agrees with both arguments of the State.

¶23. This Court may find either (1) that Goodin does not meet the standard of mental retardation or (2) that Goodin has met enough of an initial burden to have the matter of mental retardation remanded for a hearing before the trial court. The Legislature adopted the following standard in Miss. Code Ann. § 41-21-61(f) (Rev. 2001), dealing with commitments, which states in part:

> (f) "Mentally retarded person" means any person (i) who has been diagnosed as having substantial limitations in present functioning, manifested before age eighteen (18), characterized by significantly subaverage intellectual functioning, existing concurrently with related limitations in two or more of the following applicable adaptive skill areas: communication, self-care, home living, social skills, community use, self-direction, health and safety, functional academics, leisure and work . . . .

¶24.    Goodin argues that he is retarded.  In his original application he relies on the pretrial evaluation of Dr. Gerald O'Brien, that Goodin had "achieved a verbal IQ of 65, a performance IQ of 60, for a full scale IQ of 60" on the Wechsler Test.  On another test called the Shipley, Dr. O'Brien found that Goodin had "obtained an estimated (WAIS-R) IQ of 50, which also falls within the mildly retarded range."  Dr. O'Brien found that Goodin was reading at a second grade level and capable of doing math at a first grade level. Goodin points to Judge Gordon's Report of the trial, where he marked Goodin's intelligence level, as being "Low (IQ below 70)."

¶25.    The State rebuts this argument by pointing to the rest of Dr. O'Brien's evaluation, where Dr. O'Brien stated on several occasions that Goodin appeared to be malingering, not trying, or not doing as well as he was capable of, or was feigning a mental disorder.  The State points to Dr. O'Brien's finding of "no substantial evidence of significant neuropsychological problems," "intentional distortion and feigning psychological and emotional difficulties," and his conclusion that Goodin was competent and sane.  The State also comments on the remainder of Judge Gordon's trial report, which found that Goodin was attentive, cooperative and polite.   The State argues that Goodin's behavior during and after the shooting/robbery showed a level of intelligence, reasoning and planning that was inconsistent with a finding of mental retardation.

¶26.    Goodin then relies on the following items attached to his rebuttal brief:  his school records for grades 1-4 (it appears that Goodin spent three years in third grade); affidavits from relatives stating that Goodin acted strangely at times; several affidavits from OCPCC personnel stating what other people had told them about Goodin's behavior; and an affidavit from Dr. O'Brien. While Dr. O'Brien states that if he had known about Goodin's schizophrenia, he might have made different findings on the issues of IQ and

14

retardation, Dr. O'Brien's original report shows that he was aware of Goodin's claim of hearing voices, of considering suicide, of difficulties in school and of being disabled.

¶27. This Court finds that Goodin has produced enough evidence to be granted leave to proceed in the trial court on the issue of his mental retardation.

> To that end the standard or definition of mental retardation shall be that enunciated by the Supreme Court in *Atkins*, especially the American Psychiatric Association's definition of mental retardation. American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders IV 39-46 (4th ed. 1994). As Presiding Justice Smith recommends in his dissent, we further hold that the Minnesota Multiphasic Personality Inventory-II (MMPI-II) is to be administered since its associated validity scales make the test best suited to detect malingering. *See Id.* at 683 (defining malingering as the "intentional production of false or grossly exaggerated physical or psychological symptoms, motivated by external incentives such as avoiding military duty, avoiding work, obtaining financial compensation, evading criminal prosecution, or obtaining drugs"). *See also United States v. Battle*, 235 F. Supp. 2d 1301, 1307 (N.D. Ga. 2001) (explaining MMPI and its validity scales and stating that "[t]he MMPI is generally agreed to be difficult to cheat on without getting caught").

*Russell v. State*, No. 1997-DR-00046-SCT, 2003 W L 21403734, at *49 (¶ 251) (Miss. June 19, 2003). Goodin must prove that he meets the applicable standard by a preponderance of the evidence pursuant to Miss. Code Ann. § 99-39-23(7) (Rev. 2000). This issue will be considered and decided by the Newton County Circuit Court without a jury.

> **VI.     Whether trial counsel for Howard Goodin were ineffective at the penalty phase of his capital trial, depriving him of his Sixth and Fourteenth Amendment right to competent counsel, and his Eighth and Fourteenth Amendment right to have mitigating evidence presented to the jury, as well as his right to counsel under Article III, Section 26, of the Mississippi Constitution.**

¶28. As a preliminary matter the State argues that Goodin's direct appeal attorney, Edmund Phillips, raised the issue of ineffective assistance of trial counsel, Robert Brooks and Shawn Harris, on direct appeal. At trial, Will Rigdon, grandson of the victim, identified two videotapes of the occurrence in the

victim's store and identified Goodin as the person on the tapes who was robbing his grandfather. The specific issue raised on direct appeal was whether trial counsel was ineffective for failure to object to Will Rigdon's identification of Goodin. This Court resolved the matter as follows:

> First, Goodin must show that the defense counsel's performance was deficient. Perhaps Goodin's defense counsel should have objected to the identification by Will Rigdon pursuant to M.R.E. 602. However, this does not automatically mean that the error made was so serious as to deny Goodin the "counsel" guaranteed him under the Sixth Amendment. Goodin must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy. Goodin has failed to show any evidence that would overcome this presumption. However, even if Goodin had indeed met his burden of proof under the first prong of this test, he has failed to meet the second requirement set out in *Strickland*.[1]
>
> Goodin must show secondly that the deficient performance prejudiced his defense. The record simply does not support this argument. Even if defense counsel had objected to the identification by Will Rigdon and had the trial court sustained the objection, the tow truck driver later testified that he identified Goodin from the surveillance tapes shown during a news broadcast. This identification prompted him to call the police. Finally, Goodin identified himself on the tapes from Rigdon's Store during direct examination.
>
> We find that Goodin's argument does not in any way satisfy the requirements of *Strickland*. The conduct of defense counsel did not fall below the level of effective assistance of counsel as guaranteed by the Sixth Amendment. This argument is without merit.

*Goodin*, 787 So.2d at 652.

¶29.    The State argues that Goodin is procedurally barred from raising any additional issues based on ineffective assistance of trial counsel, as this could have been raised on direct appeal by Edmund Phillips and was not. The State cites *Lockett v. State*, 614 So.2d 888 (Miss. 1992), where this Court found that Lockett's attempt to raise ineffective assistance of trial counsel was procedurally barred, where appellate counsel, being different from trial counsel, had failed to do so.

---

[1] *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed. 2d 674 (1984).

¶30. Goodin cites *Faraga v. State*, 514 So.2d 295 (Miss. 1987) (direct appeal), and 557 So.2d 771 (Miss. 1990) (post-conviction). Faraga was convicted of capital murder and sentenced to death. On direct appeal Faraga's appellate counsel, being different from trial counsel, raised numerous issues of ineffective assistance of trial counsel at the guilt and sentencing phases. This Court found all such issues without merit and affirmed. Faraga subsequently filed an application for post-conviction relief in this Court. This application raised the issue of possible withholding of exculpatory material by the State from Faraga, or ineffective assistance of counsel for failure to request the material. This issue was not raised on direct appeal. This Court granted Faraga's application to proceed in the circuit court. *Faraga*, 557 So.2d at 775. *See also* **Hymes v. State**, 703 So.2d 258, 261 (Miss. 1997) (ineffective assistance claim was arguably procedurally barred on post-conviction because of not being raised on direct appeal but Court would allow inmate to proceed where appellate counsel's brief was "exceedingly incoherent" and post-conviction proceeding was usual avenue for pursuing ineffective assistance claim even where trial and appellate counsel are different). Therefore, there is conflicting authority on whether this Court should apply the procedural bar.

¶31. The issue of Goodin's mental capacity was first raised when defense counsel filed a Motion for Psychiatric Examination on December 7, 1998. Defense counsel attached his affidavit stating that he believed that Goodin was "of insufficient soundness of mind to make a rational defense" in the case and "should be ordered to submit to psychiatric examination, observation, and evaluation." The motion also stated that Goodin had been released from prison in June 1998 and during that prison term he was "incarcerated in the psychiatric ward and was treated by the psychiatrist of said ward." Also on December 7, during Goodin's arraignment, defense counsel mentioned the motion to Judge Gordon, who indicated he would grant the motion.

¶32.     On December 10, 1998, Judge Gordon entered an Order for Psychiatric and Psychological Examination stating that Goodin should be examined by Dr. Gerald O'Brien, a psychologist, and Dr. Donald Guild, a psychiatrist. The order stated that the doctors should "determine [Goodin's] present ability to stand trial and assist his attorneys in his defense; and further examine him to determine his ability to know the difference between right and wrong and to understand the nature and quality of his actions at the time of the alleged offenses. Upon completion of said examination, said psychologist and psychiatrist shall make a written report of his findings. . . ."

¶33.     On February 10, 1999, Judge Gordon entered an Order for Psychological Examination stating that Goodin should be examined by Dr. O'Brien. On February 16, 1999, during motions hearing, Judge Gordon asked if Goodin had been examined. Defense counsel stated that he had, "but that Dr. Guild in his report requested further examination by Dr. O'Brien, and there is an order entered February 10th ordering that and scheduled him to go [on] an appointment this Friday, February 19th, 1999, for further additional examination."

¶34.     The reports made by Drs. O'Brien and Guild were not included as a part of this record in Goodin's direct appeal. Judge Gordon made no findings on the record and entered no orders on the mental state of Goodin. Goodin was apparently determined to be competent because otherwise the trial would not have taken place.

¶35.     Goodin has attached Dr. O'Brien's report, dated February 24, 1999, as Exhibit 2 to his application. Dr. O'Brien administered, or attempted to administer, a number of tests. Dr. O'Brien suggested in several places that Goodin may not have been trying very hard: "[H]is degree of apparent effort and motivation strongly suggest these scores underestimate his level of functioning. . . . Results on all these tasks must be viewed with caution as they are confounded with this questionable effort and

18

motivation. . . . [A]bility test results tend to underestimate his overall intellectual functioning and reflect his level of motivation and cooperation . . . . This pattern is characteristic of individuals who are feigning a mental disorder, and is rarely seen in those responding truthfully."

¶36.    As to Goodin's mental status examination, Dr. O'Brien stated that Goodin was "less than cooperative," giving a "slightly incorrect response to an arithmetic question, or refus[ing] to respond when asked a question which should have been well within his apparent ability range." Goodin described hearing voices which he said were connected to demons and Satan. Goodin said that he had trouble sleeping and had suicidal thoughts when incarcerated at Parchman in 1993. He had received some psychological treatment when previously incarcerated. He complained about not getting his SSI check. He denied that he was guilty of capital murder.

¶37.    Dr. O'Brien concluded:

Howard Goodin is a 44 year old African American male whose intellectual functioning falls at least in the borderline range, and whose test scores underestimate his intellectual functioning. Generally there is no substantial evidence of significant neuropsychological problems. His performance on ability tests and his approach to other tasks reflect his level of motivation and cooperation, which is strongly suggestive of intentional distortion and feigning psychological and emotional difficulties.

Clinical observations reveal a minimal level of distress, which is likely attributable to his current legal situation. He is certainly suspicious of others, especially those in authority, which seems consistent with past cultural and institutional experiences. His reported hallucinations and other reported beliefs may have similar underpinnings, but appear at best extremely exaggerated as to their effect on his functioning.

It is my opinion, based on all the information available, that he does not exhibit a psychosis or other significant psychological disorder which would affect his understanding the nature and quality of his actions, including whether they were right or wrong, and conforming his behavior to the requirements of the law. He also appears competent to stand trial and to assist in his own defense.

19

¶38.    Goodin also attached, as Exhibit 4 to his application, an evaluation of him by Michael Whelan, Ph.D., a psychologist in Greenwood. The evaluation is dated May 13, 1998, and was apparently performed during Goodin's incarceration, though the reason for the evaluation is not known. The unsigned evaluation is divided into History, Daily Activities, Mental Status, and Conclusion. The primary mental symptom Goodin complained of for the previous three to five years was auditory hallucinations, for which he had been treated with anti-psychotic medication. The hallucinations seemed to have a religious basis, dealing with Jesus, Satan and demons. Goodin also complained of having trouble sleeping. Goodin had not been hospitalized for psychosis but had been treated as an outpatient. Dr. Whelan did not think Goodin should be considered competent to manage money should he be awarded disability benefits because he had been incarcerated most of his adult life. Dr. Whelan found that Goodin "probably has an IQ in the middle 70's." Dr. Whelan concluded:

> I think the patient suffers from chronic paranoid schizophrenia. His institutional record suggest that he is a withdrawn and isolated inmate. He is described as rarely participating in conversations on the unit and tends to stay to himself. I think his prognosis for the future is guarded due to the chronicity of his symptoms. He probably has a very low tolerance for stress and his insight into his illness is limited. However, he has been compliant with medication and if he remains compliant when is released from prison, then he should be able to function with at least minimal adequacy if his sister's environment is stress free.

¶39.    Goodin attached an affidavit from Dr. O'Brien to his rebuttal which states that Dr. O'Brien conducted his competency evaluation of Goodin with only the documents supplied by the State. Dr. O'Brien states that he has now reviewed additional materials supplied by Goodin which "would have been a significant factor in my forensic evaluation." Dr. O'Brien found that the records showing Goodin to be schizophrenic "would have been significant, not just in terms of determining whether Mr. Gooden was mentally ill but also for assessing whether he was mentally retarded." Dr. O'Brien stated that Goodin had

20

an IQ of 60, in the mildly mentally retarded range, but he suspected at the time that Goodin was malingering. Dr. O'Brien stated that he might have reached a different conclusion had he known of the records in question. Dr. O'Brien stated that Goodin's school records and social security records were significant in a determination of retardation. Dr. O'Brien stated that Goodin should have been treated for schizophrenia and then reevaluated and retested. Dr. O'Brien stated that it was difficult to evaluate whether someone was retarded when they also suffered from mental illness. Dr. O'Brien "strongly recommended that Mr. Goodin receive a thorough evaluation both to thoroughly assess his mental illness and to determine whether he is mentally retarded. Based on the records and my prior testing, I believe that there is a significant likelihood that Mr. Gooden may in fact be mentally retarded."

### A. Whether counsel failed to investigate mental retardation.

¶40. Goodin argues that his trial attorneys failed to investigate his mental retardation at trial. Robert N. Brooks, one of Goodin's trial attorneys, executed an affidavit which was attached to Goodin's Rebuttal Brief. Brooks's affidavit contained the following statement:

> When I represented Mr. Gooden, I had just litigated the capital murder trial of Mack Wells. In Mr. Wells' case I presented evidence of mental retardation. Because Mr. Wells was still sentenced to death, I felt presenting such evidence was futile. Even though I was aware of the fact that Mr. Gooden's IQ was low and that I had great difficulty communicating with him, I did not raise his retardation or investigate it further for mitigation purposes.

¶41. In addition, even though it could have been raised for mitigation purposes, at the time of Goodin's trial and direct appeal, execution of the mentally retarded was constitutional. This Court is granting Goodin's leave to seek post-conviction relief in the trial court based upon his alleged mental retardation. If Goodin is found to be mentally retarded within the meaning of *Atkins* then he cannot be executed.

21

However, if he is found not to be retarded then counsel's allegedly deficient conduct in this area is irrelevant.

### B. Whether counsel failed to investigate mental illness.

¶42. Robert N. Brooks, one of the defense attorneys for Goodin at his trial, stated the following in his affidavit:

> I knew something was wrong with Mr. Gooden, besides the retardation, but I really couldn't put my finger on why he was so odd. I never knew Mr. Gooden was a diagnosed paranoid schizophrenic or that he was receiving Social Security Disability for his condition. He mentioned it for the first time in passing on the stand at trial, at which point it was too late to follow up with investigation. I have never seen the Laird Hospital or Weems Records concerning Mr. Gooden's schizophrenia. I have never seen the Social Security Records concerning Mr. Gooden's schizophrenia. Had I known Mr. Gooden was certifiably schizophrenic, I would have put doctors on the stand from Laird, Weems, etc. to assist in his mitigation. I definitely would have put Dr. Whelan on the stand had I seen his 1998 report before trial. I would have given any reports concerning prior diagnoses of Mr. Gooden to Dr. O'Brien to consider in his evaluation had I known of any of these. Given the time and resources I had to prepare for this capital murder trial, there was simply no way I could have known to look for Mr. Gooden's records because the times I spoke with the client he was very crazy and not helpful in preparing his defense at all. I had to get his sister to talk to him on occasion for me in order to explain things to him. I begged Mr. Gooden not to take the stand, but he was completely irrational and would not listen to the advice of counsel in that regard.

¶43. This Court grants Goodin leave to proceed in the trial court on the issue of whether his attorney was ineffective for failure to investigate whether he was mentally ill. *See* ***Wiggins v. Smith***, 123 S. Ct. 2527 (2003).

### C. Whether counsel failed to investigate client's competency.

¶44. Goodin argues that "when counsel had Mr. Gooden examined for competency to stand trial, the evaluator failed to take into account Mr. Gooden's long-standing history of mental illness and dismissed his claims about hallucinations, finding him competent. It is unlikely that Mr. Gooden would even have

22

been found competent to stand trial had counsel done their job." Goodin's argument here is similar to his argument under 6.B., but this argument also calls into question the nature of the process of determining a defendant's competency to stand trial and the defense counsel's role in that process. First, defense counsel did not have Goodin examined; the circuit court did. Defense counsel did not, as far as this Court can tell, select Dr. O'Brien. It is unknown whether defense counsel did have or could have had any input into Dr. O'Brien's decision on competency. It is also unknown whether Dr. O'Brien would have considered any findings by any other doctors in making his decision. He says now that he would have. If defense counsel had evidence contrary to Dr. O'Brien's conclusions, it would have been advisable to present those to the circuit court so they could have been considered. Defense counsel now states in an affidavit that he would have done this but did not have the time or resources.

¶45.    What is known is that defense counsel did not object to Dr. O'Brien's conclusions as incorrect and did not object to the circuit court's finding of Goodin as competent. Any attempt to raise the circuit court's finding of competency as erroneous, as Goodin does, is procedurally barred at this point. Only because this issue is so closely related to the issue of Goodin's mental illness, this Court finds that Goodin be granted leave to proceed in the trial court on this particular issue.

> **VII.    Whether Petitioner was denied his constitutional rights guaranteed by the 6th, 8th and 14th Amendments to the United States Constitution and its Mississippi Constitutional corollary due to the cumulative effect of errors at both the guilt and penalty phases of his capital trial.**

¶46.    Goodin next argues that, even if no one error is sufficient by itself to serve as a basis for a grant of relief, this Court should consider the cumulative effect of the errors alleged by Goodin. As stated above, this Court grants leave for Goodin to proceed to the trial court on the particular issues enumerated in this opinion.

## VIII. Whether Petitioner was denied the right to the effective assistance of counsel on appeal.

¶47. Goodin argues that he was denied adequate representation on direct appeal, and that there was a reasonable probability that, if he had been adequately represented, the result of his appeal would have been different. Goodin states that appellate counsel failed to raise a majority of the prosecutorial misconduct claims available; failed to raise the dying declaration issue; and failed to raise trial counsel's conduct as to the mental health/insanity/competency issue

¶48. Appellate counsel did raise one issue concerning misconduct over closing argument, which this Court seemed to find meritorious, except for the fact that Goodin was overwhelmingly guilty, which made the prosecutor's conduct irrelevant. It does not appear that this Court would have found any of the other issues concerning misconduct to amount to reversible error, if they had been raised, where the previous issue did not rise to this level. In addition, these other issues would have been procedurally barred on direct appeal because there was no contemporaneous objection at trial. This Court finds that failure to raise these other issues was not ineffective assistance of appellate counsel.

¶49. As to dying declaration, the merits of that issue are discussed next. In summary, this Court finds that the trial court did not err in admitting the statement of Willis Rigdon; therefore, appellate counsel was not ineffective for failure to raise it on direct appeal.

¶50. As to mental health/insanity/competency, there is little in the appeal record to make much of an argument. None of the reports made by either Dr. O'Brien or Dr. Guild were made a part of this record in Goodin's direct appeal. Judge Gordon made no findings on the record and entered no orders on the mental capacity of Goodin. Goodin took the stand and testified. While his testimony may not have been

articulate or effective, this testimony did not demonstrate that Goodin was insane. This issue is without merit.

> ### IX. Whether the trial court erred in admitting an irrelevant dying declaration in violation of MRE 401, 402, 403 as well as Petitioner's 6th, 8th, and 14th Amendment rights under the Constitution of the United States and its Mississippi constitutional corollaries.

¶51. Goodin last argues that the trial court erred in allowing Mitchell Graham to testify that a wounded Willis Rigdon told him that he did not know the man who had shot and robbed him, but his attacker was a black man. Goodin variously argues that the statement was irrelevant, it was more prejudicial than probative, and it did not meet the identification criteria necessary for admission as a dying declaration.

¶52. The State argues that Goodin objected to the statement at trial on a different basis than he is objecting now; therefore, his objection is procedurally barred. The State also argues that this issue was not raised on direct appeal and therefore, Goodin is procedurally barred from raising it now. *See* Miss. Code Ann. § 99-39-21(1).

¶53. A review of the record shows that at trial the statement in question was offered both under the excited utterance hearsay exception found in M.R.E. 803(2) and the dying declaration hearsay exception found in M.R.E. 804(b)(2). Defense counsel objected, stating that the statement was hearsay, or that the hearsay exceptions had not been met. Outside the presence of the jury, defense counsel argued that the statement did not qualify as an excited utterance because the element of spontaneity was not present. As to dying declaration, defense counsel argued that Willis Rigdon did not believe his death to be imminent because he was asking for help, and the testimony from Ted Atkins, a paramedic who treated Rigdon, was not sufficient to support the notion that Rigdon was mortally wounded. The trial court found that the statement was admissible as a dying declaration.

¶54. The State is correct that Goodin is raising objections here that are different from those raised before the trial court. Even more importantly, the State is correct that this issue was not raised on direct appeal. Goodin is procedurally barred from raising it here.

¶55. As to the merits of Goodin's argument, Ridgon's statement was obviously relevant. Racial characteristics are unavoidably important factors in identification of defendants in criminal cases. This does not mean that race became an "improper issue" in this case as Goodin argues. If Rigdon had stated that a white man had shot him, that would also be relevant, and Goodin would have fought to have it admitted.

¶56. Goodin argues that a dying declaration is inadmissible unless it names a specific person. Goodin cites a number of cases from this Court and others where a specific person was named, but cites nothing that states that dying declarations are limited to this circumstance. Goodin also argues that Rigdon's statement could not pass muster as an identification of Goodin under *Neil v. Biggers*, 409 U.S. 188, 93 S.Ct. 375, 34 L. Ed. 2d 401 (1972). While Rigdon's statement alone did identify Goodin, it is one piece of circumstantial evidence which supported the State's case. Considering that Goodin could be seen on the surveillance videotape of Rigdon's store, was driving Rigdon's truck, was in possession of cash, a pistol, a television and a VCR, Rigdon's statement corroborates this other evidence to a limited extent. Rigdon's statement was probably unnecessary evidence, but it was not inadmissible on the grounds argued here. Therefore, this issue is without merit.

## CONCLUSION

¶57. We deny the State's Motion to Strike Petitioner's Rebuttal Brief. We grant Howard Goodin's Application for Leave to File Petition for Post-Conviction Relief limited to the following issues: (1) mental retardation; (2) ineffective assistance of counsel on the issue of mental illness and (3) ineffective assistance of counsel on the issue of competency.

26

¶58. Goodin is granted leave to proceed in the trial court on the issue of whether he is mentally retarded such that he may not be executed under *Atkins v. Virginia*. The standard or definition of mental retardation shall be that enunciated by the United States Supreme Court in *Atkins*. Goodin must prove that he meets the applicable standard by a preponderance of the evidence pursuant to Miss. Code Ann. § 99-39-23(7) (Rev. 2000). This issue will be considered and decided by the Newton County Circuit Court without a jury.

¶59. We deny Goodin's application in all other respects.

¶60. **APPLICATION FOR LEAVE TO FILE PETITION FOR POST-CONVICTION RELIEF, GRANTED IN PART AND DENIED IN PART.**

**PITTMAN, C.J., SMITH, P.J., WALLER, COBB AND GRAVES, JJ., CONCUR. McRAE, P.J., CONCURS IN RESULT ONLY. EASLEY, J., DISSENTS WITHOUT SEPARATE WRITTEN OPINION. DIAZ, J., NOT PARTICIPATING.**